940 F.2d 77
 33 Fed. R. Evid. Serv. 680, Prod.Liab.Rep.(CCH)P 12,864
Diana L. MOSSER, Administratrix of the Estate of David W.
Mosser, Jr., deceased, Plaintiff-Appellant,
v.
FRUEHAUF CORPORATION, a/k/a Fruehauf Division; Fruehauf
Corporation, Defendants-Appellees,
and
C.M. American, Division of Columbus McKinnon Corporation, a
foreign corporation; National Steel Corporation, a Delaware
Corporation; American Chain and Cable Company; Babcock
International, Incorporated; American Chain Division of
Acco-Babcock, Incorporated; American Chain Division of
American Chain and Cable Company, Incorporated, Defendants,
v.
WEIR COVE MOVING & STORAGE COMPANY; Innovative Industries,
Incorporated, Third Party Defendants.
Diana L. MOSSER, Administratrix of the Estate of David W.
Mosser, Jr., deceased, Plaintiff-Appellee,
v.
FRUEHAUF CORPORATION, a/k/a Fruehauf Division; Fruehauf
Corporation, Defendants-Appellants,
and
American Chain Division of American Chain and Cable Company,
Incorporated; American Chain and Cable Company; Babcock
International, Incorporated; C.M. American, Division of
Columbus McKinnon Corporation; National Steel Corporation;
American Chain Division of Acco-Babcock, Incorporated,
Babcock International Incorporated, Defendants,
v.
WEIR COVE MOVING & STORAGE COMPANY; Innovative Industries,
Incorporated, Third Party Defendants.
Diana L. MOSSER, Administratrix of the Estate of David W.
Mosser, Jr., deceased, Plaintiff-Appellee,
v.
FRUEHAUF CORPORATION, a/k/a Fruehauf Division; Fruehauf
Corporation, Defendants-Appellants,
and
American Chain Division of American Chain and Cable Company,
Incorporated; American Chain and Cable Company; Babcock
International, Incorporated; C.M. American, Division of
Columbus McKinnon Corporation; National Steel Corporation;
American Chain Division of Acco-Babcock, Incorporated, Defendants,
v.
WEIR COVE MOVING & STORAGE COMPANY; Innovative Industries,
Incorporated, Third Party Defendants. (Two Cases)
Diana L. MOSSER, Administratrix of the Estate of David W.
Mosser, Jr., deceased, Plaintiff-Appellee,
v.
FRUEHAUF CORPORATION, a/k/a Fruehauf Division; Fruehauf
Corporation, Defendants-Appellants,
and
American Chain and Cable Company; Babcock International,
Incorporated; American Chain Division of Acco-Babcock,
Incorporated; C.M. American, Division of Columbus McKinnon
Corporation; National Steel Corporation; American Chain
Division of American Chain and Cable Company, Incorporated, Defendants,
v.
INNOVATIVE INDUSTRIES, INCORPORATED; Weir Cove Moving &
Storage Company, Third Party Defendants.
 Nos. 90-2394 to 90-2398.
 United States Court of Appeals,
Fourth Circuit.
 Argued March 5, 1991.
Decided July 11, 1991.
As Amended Aug. 6, 1991.
 
 Edward Andrew Zagula, argued (Barry Hill, on brief), Zagula, Hill & Dittmar, Weirton, W.Va., for defendants-appellants.
 Richard S. Dorfzaun, argued (W. Scott Campbell, on brief), Dickie, McCamey & Chilcote, Pittsburgh, Pa., for plaintiff-appellee.
 Before RUSSELL and WILKINSON, Circuit Judges, and DUPREE, Senior District Judge for the Eastern District of North Carolina, sitting by designation.
 OPINION
 WILKINSON, Circuit Judge:
 
 
 1
 This case raises recurrent questions about punitive damage awards in products liability suits. The district court found ample support for the jury award of compensatory damages in this wrongful death action against Fruehauf Corporation for the manufacture of an allegedly defective flatbed trailer. However, the court set aside the punitive award shortly after its return. On appeal, Fruehauf challenges the compensatory award and plaintiff seeks reinstatement of the punitive verdict. Finding no error in any of the trial court's rulings and finding the evidence insufficient to support punitive damages as a matter of law, we affirm.
 
 I.
 
 2
 This diversity case arises out of the accidental death of David W. Mosser on August 21, 1981 when the tractor-trailer he was driving overturned. At the time of the accident, Mosser was hauling three steel coils for his employer, Weir-Cove Moving & Storage Company. The steel coils--whose combined weight was in excess of sixty thousand pounds--were tied down directly to the flatbed trailer's aluminum side rail assemblies. These assemblies run the length of both sides of the flatbed trailer and include a side rail which is attached to the truck and an outside rub rail which is attached to the side rail with alternating stake pockets and spacers or spools.
 
 
 3
 Diana L. Mosser, the decedent's wife, filed a products liability suit against Fruehauf Corporation, the manufacturer of the trailer, in the Circuit Court of Hancock County, West Virginia. After the case was removed to federal court, a jury trial was held and the issues of compensatory and punitive damages were bifurcated.
 
 
 4
 As to liability, the parties offered different explanations on the cause of the accident. Mosser argued that defects in the trailer's modified aluminum side rail assembly caused the load of steel coils to shift and come loose, thereby causing the accident. Fruehauf contended that it was David Mosser's excessive speed as he entered a turn that caused centrifugal force to pull the vehicle over. Fruehauf moved for a directed verdict on punitive damages after completion of the plaintiff's case-in-chief and the district court denied the motion.
 
 
 5
 The jury determined that Fruehauf was negligent in the manufacture of the trailer and that such negligence was a proximate cause of the accident. The jury also concluded that plaintiff's decedent was nine percent at fault due to speeding and that Fruehauf was ninety-one percent at fault with respect to the accident and awarded plaintiff compensatory damages in the amount of $1,400,000.
 
 
 6
 In the second portion of the trial, evidence was presented on the issue of punitive damages. Fruehauf renewed its motion for a directed verdict on punitive damages several times; the court held the motion under advisement. At the conclusion of the trial, the jury awarded $5,500,000 in punitive damages to Mosser, responding affirmatively to a special verdict form which asked "Do you find from a preponderance of the evidence that the defendant, Fruehauf Corporation, acted in a wanton or oppressive manner, or with such malice as implied a spirit of mischief, or criminal indifference to civil obligations?" The district judge, sua sponte, set aside the award, explaining that "[t]here simply was not enough evidence to justify a finding warranting punitive damages."
 
 
 7
 Fruehauf moved for entry of judgment notwithstanding the verdict, a new trial and remittitur--all with respect to the compensatory verdict. Mosser moved for reinstatement of the punitive award. These post-judgment motions were denied. The district court did, however, grant Fruehauf's motion to reduce Mosser's verdict by the $100,000 paid by a settling co-defendant and by $126,000 which represented the amount attributable to Mosser's nine percent fault. An amended judgment was then entered for Mosser in the amount of $1,174,000.
 
 
 8
 This appeal followed.
 
 II.
 
 9
 Fruehauf challenges the jury's compensatory award on several fronts. We see no error, however, in the district court's refusal to grant Fruehauf's motions for a new trial, remittitur, and judgment notwithstanding the verdict.
 
 
 10
 First, we reject Fruehauf's argument that the district court abused its discretion in ruling inadmissible David Mosser's personnel file at Weir-Cove which showed that he had received citations for speeding. Fruehauf argues that the evidence was admissible under Fed.R.Evid. 406 as evidence of habit or, in the alternative, under Fed.R.Evid. 404(b) as proof of intent. The district court did not err, however, in declining to admit traffic citations unrelated to the incident in question against a dead man unable to defend himself. Moreover, exclusion of the file was harmless in any event because Fruehauf presented eyewitness testimony that Mosser was in fact speeding just prior to the accident.
 
 
 11
 In a similar vein, the decision of the district court to allow police officer Ralph Fletcher to testify as an expert falls within the broad discretion accorded trial courts in such matters, see Boleski v. American Export Lines, Inc., 385 F.2d 69, 71 (4th Cir.1967), particularly in light of the fact that Fletcher's testimony was limited largely to his specialty of the significance of road markings. Moreover, Fletcher had completed an accident reconstruction course at Northwestern University, had consulted in numerous cases for various law enforcement agencies and for private parties, and had served as an accident investigation instructor at the West Virginia State Police Academy.
 
 
 12
 Fruehauf next contends that the district court erred in refusing to grant a mistrial based on improper statements by Mosser's counsel in closing argument. Specifically, Fruehauf complains that Mosser's counsel referred to himself as an "old war horse" and then stated "if she [plaintiff] is entitled to an award in this case, it is the one million one hundred thousand dollars nine hundred, whatever thousand dollars."
 
 
 13
 The discussion of specific damage amounts in closing argument is not a matter that can be resolved in a vacuum. The propriety of any reference to specific figures may well depend on the extent to which that reference is grounded in the evidence. See Murphy v. National R.R. Passenger Corp., 547 F.2d 816, 818 (4th Cir.1977). There is always the danger that a jury "may give undue weight to the figures advanced by plaintiff's counsel" particularly where counsel portrays himself as experienced in such matters. Mileski v. Long Island R.R. Co., 499 F.2d 1169, 1172 (2d Cir.1974). Since damages for pain and suffering--or for sorrow and solace in a wrongful death case, see W.Va. Code Sec. 55-7-6 (1981 & Supp.1991)--in particular are difficult to evaluate, the trial court may impose appropriate restrictions on counsel's argument. Murphy, 547 F.2d at 818. If some specific damage amount for intangible loss is alluded to, the trial court should "certainly not limit itself to the frequently used 'boiler-plate' type of charge to the effect that 'arguments of counsel are not evidence,' " Mileski, 499 F.2d at 1174, but should specifically "caution the jury that the dollar figures mentioned by counsel do not constitute evidence but merely represent argument which the jury may disregard in its deliberations." Murphy, 547 F.2d at 818.
 
 
 14
 The reference in this case was garbled. In stating "one million one hundred thousand dollars nine hundred, whatever thousand dollars," counsel here appeared to be alluding to an economic loss figure put into evidence by Mosser's expert without objection. The district court cut short the line of argument and carefully instructed the jury that counsels' statements in closing argument were not evidence. Fruehauf failed to request any other more specific curative instruction. Under these circumstances, we credit the judgment of the trial court that counsel's reference did not "rise to a level warranting a mistrial."[1]
 
 
 15
 Additionally, Fruehauf argues that Mosser's counsel improperly incited the jury, in particular with the following remark: "You let them know that they [Fruehauf] can't kill a man like that in the Ohio Valley and not pay for it." Even allowing for the flourishes that may attach to closing argument, this statement was improper. It had nothing to do with the evidence and represented a transparent attempt to inflame the passions of the jury. The question, however, is whether the statement so poisoned the entire proceedings as to warrant a mistrial. In this regard, we once again choose to credit the judgment of the trial court who heard the extended closing arguments in their entirety and gave a calming instruction designed specifically to focus the jury's attention on the evidence and to have it put aside any impermissible influences of "sympathy or prejudice or bias for or against any party." The trial court had to balance the need to control the intemperate conduct of counsel with the unfairness of aborting a three-day trial at the eleventh hour. The trial court's own evident distaste for the remark in question did not cause it to conclude that this jury trial was other than a just one and we will in this instance match its example of restraint with our own.
 
 
 16
 In a related argument, Fruehauf challenges the compensatory verdict as excessive and not supported by the evidence. We, however, see no error in the district court's refusal to set it aside. "The proper role of the trial and appellate courts in the federal system in reviewing the size of jury verdicts is ... a matter of federal law." Donovan v. Penn Shipping Co., 429 U.S. 648, 649, 97 S.Ct. 835, 837, 51 L.Ed.2d 112 (1977). In that regard, a district court's decision whether to set aside an award of damages as excessive is "a discretionary one ... that we review with even more than ordinary deference." Spell v. McDaniel, 824 F.2d 1380, 1400 (4th Cir.1987). The court explained that, at trial, Mosser's expert testified that David Mosser would have earned between $962,320 and $1,091,638 over the course of his employment and that his personal maintenance expenses would have been between $205,374 and $239,506, leaving a balance of between $756,946 and $852,132. Whichever of these figures the jury credited, the balance of the award, which presumably constituted noneconomic loss, was not "outrageous." See Grunenthal v. Long Island R.R. Co., 393 U.S. 156, 160, 89 S.Ct. 331, 334, 21 L.Ed.2d 309 (1968).
 
 
 17
 Finally, Fruehauf asserts that the district court erred in denying its motion for judgment notwithstanding the verdict because Mosser failed to offer sufficient expert testimony to support her theory on the critical issue of causation. Fruehauf contends that the testimony given by Mosser's one expert was "speculative, vague, unspecific, and insufficient to support the jury's verdict." As the district court noted, however, "[a]lthough defendant's experts may have outnumbered plaintiff's one expert, it was for the jury to weigh the evidence and the credibility of each expert." We see no virtue in a rule that would require plaintiffs to present cumulative expert testimony in order to prevail.
 
 III.
 
 18
 While we uphold the compensatory award to Mosser, we believe that the evidence is insufficient to support punitive damages as a matter of law and affirm the district court's action in setting that award aside.[2] The district court properly refused to inflate a case of carelessness into one of wanton disregard. As the district court held, "the evidence speaks of negligence, not of such recklessness as would support the jury's punitive award."
 
 
 19
 " 'Punitive damages have long been a part of traditional state tort law.' " Pacific Mutual Life Insurance Co. v. Haslip, --- U.S. ----, 111 S.Ct. 1032, 1041, 113 L.Ed.2d 1 (1991) (quoting Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 255, 104 S.Ct. 615, 625, 78 L.Ed.2d 443 (1984)). "In a diversity action, or in any other lawsuit where state law provides the basis of decision, the propriety of an award of punitive damages for the conduct in question, and the factors the jury may consider in determining their amount, are questions of state law." Browning-Ferris Industries, Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 278, 109 S.Ct. 2909, 2922, 106 L.Ed.2d 219 (1989). In order for a plaintiff to recover punitive damages in West Virginia, the "defendant must be shown to have engaged in a wilful, wanton, reckless, or malicious act." Tri-State Asphalt Products, Inc. v. McDonough Co., 391 S.E.2d 907, 913 (W.Va.1990). See also Warden v. Bank of Mingo, 341 S.E.2d 679, 684 (W.Va.1985) (punitive damages allowed "only where there has been malice, fraud, oppression or gross negligence."). West Virginia law thus appears to be in accord with the common law as expressed generally by the Restatement (Second) of Torts: "Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." Restatement (Second) of Torts Sec. 908(2) (1979).[3]
 
 
 20
 As the district court noted, "[p]laintiff showed no evidence of willful, wanton, or malicious conduct reflecting a spirit of mischief or spite." Nor does Mosser point to any evidence that Fruehauf acted intentionally to harm the public. In this case, Mosser is constrained to argue that Fruehauf evidenced a "reckless indifference to the rights of others." We will first consider, therefore, Mosser's allegations of recklessness based on assertions that Fruehauf actually knew, or had reason to know, of the dangers inherent in the aluminum side rail assembly. Second, we will examine whether Fruehauf acted recklessly in failing to determine the strength of the assembly.
 
 A.
 
 21
 Terms such as "wanton" and "reckless" are among the law's most indeterminate. However, some consensus has emerged on the minimum requirements necessary to support an award of punitive damages in products liability cases. One leading scholar notes that two elements must combine for a punitive award in such cases: 1) "defendant's knowledge of a product defect 'and of the potential harm which that defect posed to consumers,' " and 2) "some kind of 'fault,' consisting 'of a defendant failing to take some action which the products and marketing circumstances demand.' " 2 M. Shapo, The Law of Products Liability p 29.02 (1990) (quoting Ghiardi and Kircher, Punitive Damage Recovery in Products Liability Cases, 65 Marq.L.Rev. 1, 83-84 (1981)). "Although intent to injure is not necessary, some type of aggravated conduct (knowledge, at the least) is a needed component." Walter v. Cessna Aircraft Co., 121 Wis.2d 221, 358 N.W.2d 816, 819 (Ct.App.1984). Indeed, "[w]anton and reckless conduct requires ... direct evidence of substantial knowledge on the part of the manufacturer that the product is, or is likely to become, dangerous, and a gross indifference to the danger." American Laundry Machinery Industries v. Horan, 45 Md.App. 97, 412 A.2d 407, 420 (1980).
 
 
 22
 Knowledge of the defect and conscious indifference to its danger are thus the critical factors separating recklessness from negligence. The Restatement explains that reckless misconduct differs "from that form of negligence which consists in mere inadvertence, incompetence, unskillfulness, ... in that reckless misconduct requires a conscious choice of a course of action, either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man." Restatement (Second) of Torts Sec. 500 comment g (1965) (emphasis added). It is not enough that the manufacturer perceive in a product some possible risk. Instead, to be reckless, the actor "must recognize that his conduct involves a risk substantially greater in amount than that which is necessary to make his conduct negligent. The difference between reckless misconduct and [negligence] is a difference in the degree of the risk, but this difference of degree is so marked as to amount substantially to a difference in kind." Id.
 
 
 23
 Here, Mosser has not shown that Fruehauf had actual, prior knowledge of any dangers posed by its aluminum side rail assembly system. In fact, it is undisputed that Fruehauf had no notice of any failures of the system in the field prior to David Mosser's accident. This is not a case "where the manufacturer is shown to have knowledge that its product is inherently dangerous to persons or property and that its continued use is likely to cause injury or death, but nevertheless continues to market the product without making feasible modifications to eliminate the danger or making adequate disclosure and warning of such danger." Baker v. Firestone Tire & Rubber Co., 793 F.2d 1196, 1200 (11th Cir.1986). See also, e.g., City of Greenville v. W.R. Grace & Co., 827 F.2d 975, 983 (4th Cir.1987) (punitive award warranted where there was ample evidence that manufacturer knew of the health risks associated with its product at the time of sale); Gryc v. Dayton-Hudson Corp., 297 N.W.2d 727 (Minn.1980) (punitive damages warranted in part because manufacturer on notice of the flammability of its cotton flannelette, but rejected use of flame-retardant cotton due to cost and failed to warn consumers); Gillham v. Admiral Corp., 523 F.2d 102, 109 (6th Cir.1975) (punitive award warranted where manufacturer knew that its television set design posed grave danger and failed to redesign or warn the public).
 
 
 24
 Mosser, however, argues that it may be inferred in her case that Fruehauf was aware of the danger posed by the aluminum side rail assemblies. She claims that Fruehauf knew that one of the intended uses of the trailers was the hauling of steel coils, that users commonly secured loads directly to the pockets, and that any engineer with knowledge of the relative properties of steel and aluminum would know that the aluminum assembly was much weaker than the comparably sized steel assembly also used by Fruehauf. While it is true that Joseph Kraft, one of Fruehauf's engineers, testified that the trailer as it left the factory was not suitable for hauling steel coils, these trailers were used to haul many different kinds of loads. There is also no evidence that Kraft, who apparently was not dealing directly with Weir-Cove, knew that Wier-Cove would use the trailer to haul steel coils without adding the necessary tie-down equipment. Kraft explained that the addition of tie-down accessories such as bull rings or Jerome Tiedowns--fasteners that are attached through holes in the trailer and are bolted to its cross members--would have made the trailer suitable for the hauling of steel coils. As the district court explained, Mr. Kraft simply built the trailer as ordered by the customer.
 
 
 25
 Unable to produce evidence that any single person or persons at Fruehauf knew both that Weir-Cove intended to haul steel coils without tie-down equipment and that the trailers sold to Weir-Cove were not safe for that use, Mosser argues that it is somehow permissible to fuse the knowledge of various, separate Fruehauf employees into "a single corporate consciousness." Mosser suggests that Fruehauf--when regarded as a single corporate entity--can be deemed to have had actual knowledge of the insufficient strength of the aluminum assemblies because "the sales branch knew the intended use of the trailers, and the factory branch knew the trailers were not safe for the intended use."
 
 
 26
 It is not clear, however, that the factory branch knew that the trailers were not safe for the intended use. One Fruehauf engineer, Philip DeVergilio, testified flatly that the trailers were suitable for hauling steel coils and another engineer, Adam Sweda, testified that he believed the aluminum side rails met minimum strength requirements. We do not believe, moreover, that aggregating the knowledge of various individuals will support an award here for conscious corporate disregard of public safety. To be sure, a corporation is a single legal entity, but the fact remains that the conduct for which that entity can be called to account in this case falls into the category of the careless. We may assume that Fruehauf suffered a regrettable lack of communication among its employees. In a manufacturing company such as Fruehauf, this lack of communication may very well be negligent. There is no evidence, however, that the lack of communication was purposeful or that it was somehow designed by the company to ensure deniability in a products liability suit. The deliberate blind eye to danger is simply nowhere in evidence. "Particularly with perfect hindsight," the district court noted, "it is clear that prudent business practice dictates both improved communication among the employees and improved communication between the customer and company. Further, to diminish the threat of accident, a reasonably prudent company may institute an integrated effort to anticipate dangers from misuse of the trailers and a system to insure that customers make proper modifications for specific loads." The deterrent and punitive aims of exemplary damages, however, do not permit this sloppy breakdown in company communications to be transformed into a case of deliberate corporate indifference.
 
 B.
 
 27
 Mosser also contends that Fruehauf acted recklessly in failing to determine the strength of the side rail assemblies before sale. She claims that Fruehauf failed to conduct any strength or durability tests on the aluminum side rail assemblies before suit was filed in this case and that tests conducted after suit was brought showed the pocket to fail at 8,800 pounds, well below the 16,200 pounds required by relevant federal regulations, see 49 C.F.R. Sec. 393.102 (1990). She asserts that Fruehauf's failure to test was reckless and unreasonable because testing was economically feasible, because it would have yielded useful information, because Fruehauf was aware that it was required to meet governmental strength standards, because it can be inferred from the evidence that Fruehauf knew that one of the intended uses of the trailers was the hauling of steel coils without the addition of necessary tie-down equipment, and because of the risks of harm attendant in any failure of the assembly.
 
 
 28
 The parties point to no cases indicating whether or under what conditions a failure to test would constitute conduct sufficiently egregious to warrant punitive damages as a matter of West Virginia law. It is plain that the question of when failure to test would suffice to support a punitive award cannot be answered in the abstract. Factors relevant to the reasonableness of any failure to test would include the reasons to conduct the test, the expense of testing procedures, and the likelihood that testing would provide useful information. See Owen, Punitive Damages in Products Liability Litigation, 74 Mich.L.Rev. 1258, 1340-1344 (1976). However, these factors as such bear primarily on the question of negligence and provide no support for an award of punitive damages in the absence of some evidence of conscious disregard of public safety. See Roth v. Black & Decker, Inc., 737 F.2d 779, 782 (8th Cir.1984). While plaintiff argues the evidence "probably justifies an inference" that the failure to test was the result of a "conscious decision," a punitive award must be more than speculative. There is a difference between a negligent failure to test and wanton disregard of danger and indeed authority quoted by plaintiff for breach of a manufacturer's duty to test involved negligence only, not punitive damages. See Delvaux v. Ford Motor Co., 764 F.2d 469 (7th Cir.1985).
 
 
 29
 Plaintiff points to no West Virginia case that would uphold a punitive award for failure to test on these circumstances. Many cases from other jurisdictions upholding punitive awards based in part on a failure to test involved aggravating circumstances including, significantly, the manufacturer's failure to act in the face of notice or knowledge of a defect. See, e.g., Bemer Aviation, Inc. v. Hughes Helicopter, Inc., 621 F.Supp. 290, 299 (E.D.Pa.1985) aff'd 802 F.2d 445 (3rd Cir.1986); Campus Sweater & Sportswear Co. v. M.B. Kahn Construction Co., 515 F.Supp. 64, 104 (D.S.C.1979) aff'd 644 F.2d 877 (4th Cir.1981); West v. Johnson & Johnson Products, Inc., 174 Cal.App.3d 831, 220 Cal.Rptr. 437, 460 (6 Dist.1985); Wooderson v. Ortho Pharmaceutical Corp., 235 Kan. 387, 681 P.2d 1038, 1064 (1984). As one court has explained:
 
 
 30
 The analogy can be drawn to a mechanic who fails to test the brakes on a car. Assuming that the examination should have been conducted, the mechanic is negligent but not liable for punitive damages unless it can be shown that he or she knew or had reason to know that the brakes were faulty and thus a substantial likelihood existed that the brakes would fail and result in great bodily harm.
 
 
 31
 Hoover's Dairy, Inc. v. Mid-America Dairymen, Inc., 700 S.W.2d 426, 436 (Mo.1985) (en banc).
 
 
 32
 Here, Fruehauf had no notice of any accidents or malfunctioning of the aluminum side rail assembly before decedent's accident. Further, Sweda, a Fruehauf engineer, testified that Fruehauf had no reason to test the aluminum side rail assembly because data from tests of other steel rail assemblies was available and could be used to calculate the strength of the aluminum assembly. The testimony revealed considerable uncertainty and confusion on the part of Fruehauf employees as to what testing or calculations needed to be done and what, if any, actually had been done. Again, the picture is of a disorganized company, but not a malicious one. It is true, of course, that testing always entails some cost and some delay in marketing a product, but plaintiff offers us no convincing explanation as to why it would have been in Fruehauf's best interest--economically or otherwise--to deliberately or recklessly release a dangerous product on the market with all the attendant risks of liability, customer dissatisfaction and business loss. We have heard no claim that Fruehauf was recklessly rushing a dangerous product on the market to beat a competitor or made any calculated decisions to run significant risks with public safety in order to cut costs. In terms of market pressures, the case for Fruehauf's conscious disregard of public safety--and hence the case for punitive damages--has simply not been made.[4]
 
 IV.
 
 33
 Undoubtedly, the evidence supports the jury's finding that Fruehauf's conduct was negligent. We do not believe, however, that the evidence will support an award of punitive damages under West Virginia law which "has long required more than a showing of simple negligence to recover punitive damages." Bennett v. 3 C Coal Co., 379 S.E.2d 388, 394 (W.Va.1989). Punitive damages involve a quantum leap up in the condemnation of corporate conduct and "[t]he threat of such enormous awards has a detrimental effect on the research and development of new products." Browning-Ferris Industries, 492 U.S. at 282, 109 S.Ct. at 2923 (O'Connor, J., concurring in part and dissenting in part). The district court was correct in determining that such damages should not be casually imposed. There is no evidence that Fruehauf appreciated the danger posed by the aluminum side rail assemblies and consciously ignored the risk. The company, however, should draw no comfort from this case. We agree with the district court when it stated: "The Court does not condone defendant's behavior. Its negligent ignorance and sloppy craftsmanship contributed to the loss of David Mosser's life. Defendant was in the best position to reduce the dangers by insuring that customers received either trailers tailor made for their needs or complete instructions about necessary modifications. Nevertheless, to the best of the legal system's ability, the plaintiff has been compensated for her loss; punitive damages would serve no purpose."
 
 
 34
 For the foregoing reasons, the judgment of the district court is
 
 
 35
 AFFIRMED.
 
 
 
 [1]
 Our conclusion is not altered by the fact that plaintiff's counsel stated in his initial closing argument--in conjunction with a recital of the economic loss figures advanced by her expert--that "[mental anguish] is worth a lot more, in my judgment, than the economic damages and the economic loss." We find no reversible error because no specific dollar amount was requested for mental anguish, because the trial judge gave a general curative instruction and because Fruehauf failed to request a more specific one, and because the size of the compensatory verdict suggests that plaintiff's hopes for a lavish award for mental anguish were not realized. See Salas v. Wang, 846 F.2d 897, 907-08 (3rd Cir.1988) (counsel's reference to projected $6.5 million as necessary for "just keeping [plaintiff] alive," though inappropriate, did not affect substantial rights and warrant a mistrial)
 
 
 [2]
 We find no merit in Mosser's assertion that the trial court acted impermissibly in setting aside the punitive verdict in the absence of a timely motion for judgment notwithstanding the verdict under Fed.R.Civ.P. 50(b). Here, the defendant had made several motions for a directed verdict which the district court expressly reserved. See Phoenix Savings & Loan, Inc. v. Aetna Casualty & Sur. Co., 427 F.2d 862, 873-74 (4th Cir.1970) ("it is frequently the better practice ... for the trial judge to reserve ruling on [directed verdict] motion until the jury has reached a verdict"). "In Johnson [v. New York, N.H., & H.R. Co., 344 U.S. 48, 50, 73 S.Ct. 125, 126, 97 L.Ed. 77 (1952) ], and Cone [v. West Virginia Pulp & Paper Co., 330 U.S. 212, 67 S.Ct. 752, 91 L.Ed. 849 (1947) ], the Supreme Court held that an appellate court was without power to enter a judgment notwithstanding the verdict absent a timely motion by the losing party after trial." Norton v. Snapper Power Equipment, Div. of Fuqua Industries, Inc., 806 F.2d 1545, 1547 (11th Cir.1987). As the Eleventh Circuit has noted, the same constraints need not apply at the trial level because "the district court 'could have asked the defendant to file an immediate Rule 50(b) motion, and have acted upon it. To say that it could not, instead, act on the reserved pre-verdict motion, would be to insist upon form over substance.' " Norton, 806 F.2d at 1547 (quoting First Safe Deposit National Bank v. Western Union Tel. Co., 337 F.2d 743, 746 (1st Cir.1964) (footnote omitted)). See also Nichols Constr. Corp. v. Cessna Aircraft Co., 808 F.2d 340, 354-56 (5th Cir.1985); Shaw v. Edward Hines Lumber Co., 249 F.2d 434, 436-39 (7th Cir.1957). Finally, though plaintiff noted her exception to setting aside the punitive award, she failed at trial to question whether the court could do so in the absence of a Rule 50(b) motion. Had she raised this objection, her concern could easily have been addressed and cured
 
 
 [3]
 Fruehauf contends that punitive damages must be based upon willful, wanton, or malicious conduct and that reckless misconduct is an insufficient basis for a punitive damages award, as a matter of West Virginia law. We assume, without deciding, that reckless misconduct is sufficient to justify punitive damages in West Virginia
 
 
 [4]
 Finally, plaintiff alleges in somewhat conclusory fashion that defendant misrepresented to Weir-Cove the strength of the aluminum side rail assembly and its conformance with federal safety standards. The question of course is whether any such statements amounted to the "product puffing" involved in ordinary salesmanship, negligent misrepresentation, or a deliberate pattern of falsification and deceit. The district court apparently found the statements fell into the middle category with no evidence of "a conscious disregard for the safety of others in the face of danger." We affirm its holding