**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

ATLAS FOOD SYSTEMS AND SERVICES,
INCORPORATED,
Plaintiff-Appellant,

v.

CRANE NATIONAL VENDORS,
INCORPORATED; RICHARD RICCI;

STEVEN FREEDMAN,
Defendants-Appellees,

and

MARS ELECTRONICS, INCORPORATED;
FRANK HARTMANN,
Defendants.

No. 95-1717

ATLAS FOOD SYSTEMS AND SERVICES,
INCORPORATED,
Plaintiff-Appellee,

v.

CRANE NATIONAL VENDORS,
INCORPORATED; RICHARD RICCI;

STEVEN FREEDMAN,
Defendants-Appellants,

and

MARS ELECTRONICS, INCORPORATED;
FRANK HARTMANN,
Defendants.

No. 95-1718

Appeals from the United States District Court
for the District of South Carolina, at Greenville.
Henry M. Herlong, Jr., District Judge.
(CA-92-2095-6-20)

Argued: April 5, 1996

Decided: October 30, 1996

Before HALL, NIEMEYER, and HAMILTON, Circuit Judges.

_____

Affirmed by published opinion. Judge Niemeyer wrote the opinion, in which Judge Hall and Judge Hamilton joined.

_____

**COUNSEL**

**ARGUED:** Thomas W. Traxler, CARTER, SMITH, MIRRIAM, ROGERS & TRAXLER, Greenville, South Carolina, for Appellant. George Kermit Lyall, NELSON, MULLINS, RILEY & SCARBOR-OUGH, L.L.P., Greenville, South Carolina, for Appellees. **ON BRIEF:** T. S. Stern, Jr., GRANT, LEATHERWOOD & STERN, Greenville, South Carolina, for Appellant. A. M. Quattlebaum, Jr., William S. Brown, NELSON, MULLINS, RILEY & SCARBOR-OUGH, L.L.P., Greenville, South Carolina, for Appellees.

_____

**OPINION**

NIEMEYER, Circuit Judge:

The principal issue presented in this appeal is whether the district court abused its discretion in ordering a new trial unless the plaintiff agree to a remittitur of a $3-million punitive damage award and, after the plaintiff's rejection of the remittitur and retrial, another new trial unless the plaintiff agree to a remittitur of a $4-million punitive damage award. This issue raises important questions about the scope of the district court's authority, through the grant of new trials under Federal Rule of Civil Procedure 59(a), to review jury awards of punitive damages.

2

Atlas Food System and Services, Inc., ("Atlas") sued Crane National Vendors Division of Unidynamics Corporation ("National Vendors") and two of its officers in federal court under diversity jurisdiction, demanding compensatory and punitive damages in connection with its purchase of defective vending machines. In its complaint, Atlas alleged breach of contract, breach of express and implied warranties, fraud, and deceptive and unfair trade practices under South Carolina law.[1] The jury returned a verdict against National Vendors in the amount of $1.32 million in compensatory damages and $3 million in punitive damages and against its officers in the amount of $120,000 in compensatory damages and $100,000 in punitive damages. Following post-trial motions, the district court reduced the compensatory damage award against National Vendors and found the $3-million punitive damage award excessive, granting National Vendors a new trial on punitive damages unless Atlas agree to a punitive damage award of $1 million. When Atlas refused the remittitur, the district court ordered a new trial on punitive damages.

After hearing substantially the same evidence, a second jury awarded Atlas $4 million in punitive damages. Again, on National Vendors' post-trial motion, the district court found the award excessive and ordered a third trial unless Atlas agreed to a $1 million punitive damage award. While Atlas did not agree to the remittitur of the second punitive damage award, it agreed not to demand a third trial and to accept the amount left standing following an appeal on the damage questions. Accordingly, the district court certified the case for immediate appeal pursuant to 28 U.S.C. § 1292(b), and we agreed to hear the case.

On appeal, Atlas contends that the district court abused its discretion in granting National Vendors' motions for a new trial unless Atlas agree to a remittitur and clearly erred in reducing the first jury's compensatory damage award by an amount described in Atlas' settlement agreement with Mars Electronics as consideration for a confidentiality provision. On cross-appeal, National Vendors contends that the district court erred in denying its motion for judgment as a matter

_____

[1] Atlas also sued Mars Electronics International, Inc., but it settled its claims against Mars before trial, and the trials in this case proceeded only against National Vendors and its officers.

3

of law on punitive damages after each trial and in limiting the scope of the second trial to punitive damages. The National Vendors officers joined the cross-appeal only in connection with the district court's denial of their motion for judgment as a matter of law on punitive damages.

Finding no reversible error, we affirm the rulings of the district court.

I

National Vendors had for a long time been the supplier of vending machines to Atlas, a South Carolina corporation engaged in the business of selling food to the public through vending machines. From about December 1989 through October 1991, however, National Vendors sold Atlas 340 defective machines. The defects rendered the machines susceptible to "yank-cheating," a practice by which a customer pulls his dollar bill out of a vending machine after the machine has validated the bill, thereby retaining his dollar and stealing food from the machine.

Two separate defects in National Vendors machines allowed the yank-cheating. The first defect existed in the bill validator, the component that takes in a customer's bill, validates it, and stores it in the vending machine. In February 1990, National Vendors had agreed, without Atlas' knowledge, to increase dramatically its purchase of bill validators from its secondary component supplier, Mars Electronics. Although National Vendors never informed Atlas of its commitment to buy Mars validators, it began a concerted effort in April 1990 to switch Atlas to Mars by misrepresenting that Atlas would not encounter cash shortages with Mars validators. The Mars validators, however, were defective, and some evidence indicated that National Vendors may have been aware of that problem beginning in 1991.

The second defect that permitted yank-cheating appeared in the erasable programmable output memory chips, or "Eproms" ("electronically programmable read only memory"), that created the electronic interface between the vending machine and its bill validator. National Vendors supplied the Eproms for its own machines, and the interface

4

problems Atlas experienced were attributable to National Vendors' misinterpretation of Mars Electronics' engineering specifications.

After providing National Vendors several opportunities to remedy the problems with its vending machines, Atlas revoked its acceptance of the machines in July 1992. And when National Vendors refused to refund Atlas' money, Atlas brought this diversity action against National Vendors, alleging counts for (1) revocation of acceptance, (2) breach of contract accompanied by a fraudulent act, (3) fraud, (4) constructive fraud, and (5) unfair trade practices. Atlas also named National Vendors officers, Richard Ricci and Steven Freedman, as defendants in its constructive fraud count.

After a week-long trial, the jury returned a verdict for Atlas on all claims, awarding it $1,317,822 in compensatory damages; finding that Atlas was entitled to punitive damages from each of the defendants; and finding that National Vendors' unfair trade practices had not been "willful or knowing." After the jury returned that verdict, the parties presented argument to the jury on the amount of punitive damages. Following argument, the court instructed the jury under South Carolina law that it could grant punitive damages if it found by clear and convincing evidence that one or more of the defendants' conduct was "outrageous and extraordinary" or evinced "a reckless or callous disregard of or indifference to the rights of others." Following further deliberation, the jury awarded Atlas $3 million in punitive damages from National Vendors, $60,000 from Ricci, and $40,000 from Freedman.

All three defendants filed post-trial motions for judgment in their favor as a matter of law, which the district court denied. The court did, however, reduce the compensatory damage verdict against National Vendors and add prejudgment interest, yielding a $986,510.90 compensatory damage award. Part of the court's reduction resulted from a $316,688.25 setoff to which the court found National Vendors entitled because of an earlier settlement agreement between Atlas and Mars Electronics. Although the Atlas-Mars settlement had attributed $306,668.25 as consideration for a confidentiality provision and only $10,000 as consideration for Mars' release of Atlas' claim against it for the defective bill validators, the district court concluded that the entire $316,688 sum represented payment for

5

the injury covered by Atlas' compensatory damage award from National Vendors. The court also denied the defendants' post-trial motion for judgment as a matter of law on punitive damages but granted National Vendors' motion for new trial unless Atlas agreed to reduce its punitive damage award from $3 million to $1 million. Even though the district court found that National Vendors' conduct "[a]t times . . . could be viewed as rising to the level of reckless disregard of Atlas' rights," it reasoned that the evidence did not warrant the jury's $3 million award because it showed "[a]t worst . . . miscommunication, delay, evasion of responsibility, and poor business practices on the part of National."

Atlas rejected the district court's $2 million remittitur, opting for a new trial, and the district court ordered a new trial only on punitive damages.

At the second trial, the district court advised the jury, over National Vendors' objection, about the first jury's findings and similarly permitted Atlas' counsel to make reference to those findings. The second jury returned another verdict for Atlas, this time awarding Atlas $4 million in punitive damages. The district court again denied National Vendors' post-trial motion for judgment as a matter of law on punitive damages. But the court did, once again, grant National Vendors' motion for a new trial unless Atlas agreed to reduce its punitive damage award to $1 million. In doing so the court explained that, "my ruling is identical to my previous ruling that unless the plaintiff remit[ ] all but $1 million then there will be a new trial." "If they want to keep going for more, they can do that. And if they don't produce any more different testimony, I guess this court will be required to continue to rule as it sees the facts and the law."

This appeal followed.

II

As its principal argument on appeal, Atlas contends that the district court abused its discretion in granting National Vendors' successive motions for new trials nisi remittitur after two juries awarded Atlas punitive damages of $3 million and $4 million, respectively. While acknowledging the authority of district courts to set aside juries' puni-

6

tive damage awards in exceptional cases, Atlas maintains that this is not such a case and, therefore, that the district court merely substituted its own judgment on punitive damages for that of the jury. Moreover, Atlas claims entitlement to the second jury's $4 million award because National Vendors opted to "roll the dice" by filing a motion for a new trial after the first trial, thereby relinquishing the benefit of the lower punitive damage award.

At the outset, we note that a remittitur, used in connection with Federal Rule of Civil Procedure 59(a), is the established method by which a trial judge can review a jury award for excessiveness. Remittitur is a process, dating back to 1822, by which the trial court orders a new trial unless the plaintiff accept a reduction in an excessive jury award. See Blunt v. Little, 3 F. Cas. 760 (C.C.D. Mass. 1822) (No. 1578) (Story, J.). And the permissibility of remittiturs is now settled. See 11 Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure, § 2815, at 163 (1995). Indeed, if a court finds that a jury award is excessive, it is the court's duty to require a remittitur or order a new trial. See Linn v. United Plant Guard Workers, Local 114, 383 U.S. 53, 65-66 (1966).

Absent any constitutional challenge to the amount of a jury's punitive damage award, see BMW of North America v. Gore, 116 S. Ct. 1589 (1996) (holding "grossly excessive" punitive damage award violates the Fourteenth Amendment's Due Process Clause), a federal district court reviews such an award by applying the state's substantive law of punitive damages under standards imposed by federal procedural law.[2] Thus, the district court is "to determine whether the jury's

_____

[2] South Carolina substantive law directs that a jury deciding the amount of punitive damages to be awarded consider several factors: (1) the defendant's degree of culpability; (2) the duration of the defendant's conduct; (3) the defendant's awareness or concealment of its conduct; (4) the existence of similar past conduct by the defendant; (5) the likelihood that the jury's punitive damage award will deter the defendant or others from like conduct; (6) whether the award is reasonably related to the harm likely to result from such conduct; (7) the defendant's ability to pay; and (8) any "other factors" deemed appropriate. See Gamble v. Stevenson, 406 S.E.2d 350, 354 (S.C. 1991) (establishing factors for post-trial state court review of jury verdicts); Orangeburg Sausage Co. v. Cincinnati Ins. Co., 450 S.E.2d 66, 73 (S.C. Ct. App. 1994) (requiring Gamble factors to be considered by the jury), cert. denied, 116 S. Ct. 331 (1995); see also Mattison v. Dallas Carrier Corp., 947 F.2d 95, 109-10 (4th Cir. 1991) (same).

7

verdict is within the confines set by state law, and to determine, by reference to federal standards developed under Rule 59, whether a new trial or remittitur should be ordered." Browning-Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 279 (1989); see also Defender Indus., Inc. v. Northwestern Mut. Life Ins. Co., 938 F.2d 502, 504-05 (4th Cir. 1991) (en banc). Those Rule 59 standards are well established in the Fourth Circuit:

> On such a motion it is the duty of the judge to set aside the verdict and grant a new trial, if he is of the opinion that [1] the verdict is against the clear weight of the evidence, or [2] is based upon evidence which is false, or [3] will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict.

Aetna Casualty & Sur. Co. v. Yeatts, 122 F.2d 350, 352-53 (4th Cir. 1941) (numerals added); see also Mattison v. Dallas Carrier Corp., 947 F.2d 95, 108 (4th Cir. 1991); Defender Indus., 938 F.2d at 507; Johnson v. Parrish, 827 F.2d 988, 991 (4th Cir. 1987). Appellate review of a district court's ruling under Rule 59 is for abuse of discretion. Browning-Ferris, 492 U.S. at 279.

To determine in this case whether the district court abused its discretion in granting either or both of National Vendors' new trial motions, we must examine more closely our three-pronged Rule 59 standard and the role served by each prong. The first two prongs of our review standard require a district court to determine purely factual questions: whether the jury's damages award is (1)"against the weight of the evidence" or (2) "based upon evidence which is false." Johnson, 827 F.2d at 991; Aetna Casualty , 122 F.2d at 352. This review encompasses a comparison of the factual record and the verdict to determine their compatibility. Consequently, jury determinations of factual matters such as liability on a cause of action, liability for compensatory and punitive damages, and the amount of compensatory damages will be reviewed by determining whether the jury's verdict is against the weight of the evidence or based on evidence which is false. The jury's determination of the amount of punitive damages, however, is not a factual determination about the degree of injury but is, rather, an almost unconstrained judgment or policy choice about the severity of the penalty to be imposed, given the

8

jury's underlying factual determinations about the defendant's conduct. Because the factual record provides no direct foundation for the amount of punitive damages, a review of the size of the jury's award best utilizes the third prong of the Rule 59 review standard -- whether the jury's award will result in a miscarriage of justice. See Defender Indus., 938 F.3d at 507.

The miscarriage-of-justice standard recognizes the hybrid nature of punitive damage awards. As South Carolina's punitive damages test illustrates, some considerations underlying the amount of a punitive damage award may be factual -- e.g., the defendant's ability to pay -- and, therefore, would be well suited to the jury's role of finding facts. But other policy-related elements -- e.g., the likelihood that an award will deter the defendant or others from engaging in similar conduct -- are not factual questions and, therefore, are more appropriately decided by the trial judge. The judge's unique vantage point and day-to-day experience with such matters lend expertise and consistency.

Therefore, when reviewing the amount of a jury's punitive damage award under Federal Rule of Civil Procedure 59, the district court has a participatory decisionmaking role that it does not have when reviewing a jury's findings based solely on facts. Because the jury's determination of the amount of such an award is almost entirely ungrounded in the factual record, a court cannot generally test the amount of a punitive damage award against record facts to conclude whether, for example, a jury's $10 million award or $1 million award is the correct one. And a jury, which is called upon to make that "sentencing" type of judgment only in the single case before it, is relatively ill-equipped to do so. On the other hand, the district courts not only see punitive damage awards daily, but themselves are required frequently to impose penalties for punishment and deterrence in a wide array of circumstances, both in civil and in criminal contexts. Indeed, in criminal cases, our system gives juries virtually no input, except in capital cases, to determine the amount of penalties. That division of responsibility in criminal cases influences our conclusion that in civil cases, judges should at least participate through their review responsibility in establishing a penalty amount. Cf. BMW, 116 S. Ct. at 1603 & 1603 n.38 (linking the analysis of constitutionally

9

excessive punitive damage awards to amounts of criminal statutory fines prescribed for similar conduct).

Thus, we conclude that punitive damage determinations involve a partnership between a jury and trial judge, each with a comparative institutional advantage, in which the judge inevitably enjoys the final word. While a district court must give due respect to a jury's comparative advantages in initially deciding upon the amount of punitive damages to award, the court may depart from that award to the extent that it concludes that its own comparative advantages warrant such a departure. Accordingly, we conclude that while a jury is authorized to award punitive damages on a framework of liability and the factors supplied by state law, the judgment a jury makes as to the amount is reviewable by federal trial courts under Federal Rule of Civil Procedure 59 less deferentially than are factual findings which may be measured against the factual record. The court's review of the amount of a punitive damages award should involve comparison of the court's independent judgment on the appropriate amount with the jury's award to determine whether the jury's award is so excessive as to work an injustice.

Even though, in this case, National Vendors has asserted no constitutional challenge to the amount of the punitive damage awards, we nevertheless must determine whether the Seventh Amendment constrains judicial review of the amount of a jury's punitive damage award. In Defender Industries, we held that"the seventh amendment guarantees the right to a jury determination of the amount of punitive damages" because "[a]n assessment by a jury of the amount of punitive damages is an inherent and fundamental element of the common-law right to trial by jury." 938 F.2d at 507. But Defender Industries in no way suggested that the jury's authority to award punitive damages is absolute or that the trial judge cannot, consistently with the Constitution, play a meaningful role in punitive damage determination. To the contrary, in Defender Industries we affirmed the district court's decision to set aside the jury's punitive damages award on the ground that the award "was so excessive as to constitute a miscarriage of justice." 938 F.2d at 507.

Yet more instructive is the holding in Tull v. United States, 481 U.S. 412 (1987), where the Supreme Court considered whether the

10

Seventh Amendment guaranteed a right to trial by jury on both the liability for and the amount of a statutory penalty. The Court held that while the Seventh Amendment requires that the jury determine liability for a penalty, it does not require that a jury determine its amount. Id. at 427. It explained, "highly discretionary calculations that take into account multiple factors," such as are necessary in determining a penalty, are "traditionally performed by judges." Id. Accordingly, we conclude that the Seventh Amendment imposes no barrier to the trial judge's participation in determining the amount of a punitive damages award through the review mechanism provided by remittitur and Rule 59(a).

Applying the foregoing principles to the district court's orders in this case, we cannot conclude that the district court abused its discretion in ordering successive new trials nisi remittitur. The district court reasoned that the $263,538 amount of Atlas' loss "was not terribly egregious." Moreover, because Atlas' "losses were caused by third parties who cheated the machines," National Vendors' "fraud appear-[ed] to have been based more upon sins of omission than commission." Relying on a comparison to Defender Industries, the court concluded that the relationship of National Vendors' conduct and the harm it caused was not sufficiently substantial to justify either jury's punitive damage award and warned that unless Atlas produced different testimony in future trials, it would continue "to rule as it sees the facts and the law." These conclusions fell well within the scope of the district court's authority under Rule 59(a).

III

Atlas also challenges the district court's order reducing the jury's compensatory damage award by the amount received in settlement from Mars Electronics, the manufacturer of the defective bill validator component. Mars had originally been named a defendant in this action, but after the complaint was filed and before trial, Atlas entered into a settlement agreement with Mars. In the settlement agreement, Atlas and Mars expressly allocated their $317,000 settlement amount, attributing $10,000 to Atlas' claim against Mars for the defective components and $307,000 for Atlas' agreement to keep the settlement confidential. The district court found, however, that the entire $317,000 represented consideration for the same injury covered by

11

the jury's compensatory damage award in this case. Atlas contends that the district court, in so ruling, erroneously rewrote "the contract between Atlas and Mars . . . effectively depriv[ing] Atlas of any consideration that it [received] in exchange for keeping the settlement terms confidential."

To resolve the substantive question of whether National Vendors is entitled to a setoff for the Atlas-Mars settlement, we apply South Carolina law. See Hines v. IBG Int'l, Inc., 813 F.2d 1331, 1334-355 (4th Cir. 1987); Garner v. Wyeth Lab., Inc., 585 F. Supp. 189, 191 (D.S.C. 1984). Under South Carolina law, a non-settling defendant is entitled to a pro tanto reduction of a judgment in the same cause of action. Powers v. Temple, 156 S.E.2d 759, 761 (S.C. 1967); Ward v. Epting, 351 S.E.2d 867, 875 (S.C. Ct. App. 1986). South Carolina's setoff rule rests on the "almost universally held[principle] that there can be only one satisfaction for an injury or wrong." Truesdale v. South Carolina Highway Dep't, 213 S.E.2d 740, 746 (S.C. 1975).

While state law governs the substantive right to setoff, federal law dictates our standard of review. And, under federal law, a district court's decision to set off a damage award is reviewed for clear error. See Fed. R. Civ. P. 52(a); Norfolk Shipbuilding & Drydock Corp. v. The M/Y La Belle Simone, 537 F.2d 1201, 1203 (4th Cir. 1976); see also Reilly v. United States, 863 F.2d 149, 163 (1st Cir. 1988); Cole v. United States, 861 F.2d 1261, 1263 (11th Cir. 1988). We find clear error only if, after reviewing all the evidence, we are "left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948).

At the hearing on whether to reduce Atlas' compensatory damage award because of its settlement with Mars, the district court inquired into the true nature of the Mars-Atlas settlement agreement, providing Atlas the opportunity to explain what consideration it had given for Mars' payment. But Atlas' counsel "was unable to name anything of value -- other than the claims against Mars -- that Atlas gave up for the payment." Concluding that the Mars-Atlas settlement was therefore "not, in fact, a bargained-for-exchange," the court "look[ed] beyond appearances and disregard[ed] [the] allocation of [the] settlement." Given the comparatively enormous amount that the settlement agreement had allocated to a confidentiality agreement and Atlas'

12

failure to account for it, we cannot conclude that the district court committed clear error in treating the entire $317,000 as de facto consideration for a settlement of Atlas' legal claims against Mars. Were we to indulge the parties' manipulative attribution of settlement amounts, we would compromise South Carolina's policy of permitting setoffs to ensure against multiple recovery for the same injury.

Atlas argues that by reducing the compensatory damage award by the amount of consideration given for the confidentiality of its settlement with Mars, the court rewrote the contract in violation of the holding in Ward v. Epting, 351 S.E.2d 867 (S.C. Ct. App. 1986). In Ward, the settling parties allocated $29,500 to plaintiff's pain and suffering and $500 to his wrongful death claim. In setting off only $500 on plaintiff's claim against a non-settling co-defendant on the wrongful death claim, the South Carolina court explained,"[T]here was sufficient evidence to present a jury question on [the plaintiff's] . . . pain and suffering" claim against the settling defendant. 351 S.E.2d at 875. Thus, unlike in this case, the court in Ward enforced the terms of the settlement agreement because it found that real value had been given for each portion of that agreement and, therefore, that the agreement's form conveyed its substance.

IV

On its cross-appeal, National Vendors asks us to go further than affirm the district court's remittitur; it contends that the district court erred in denying its motion for judgment as a matter of law concerning punitive damages. It argues that Atlas' evidence established, at worst, that National Vendors' employees had exhibited "sloppy communication with each other, with Mars Electronics, and with Atlas." National Vendors' officers join National Vendors on this issue, but only with respect to the district court's denial of their motion following the first trial.

Under South Carolina law, punitive damages may be awarded to punish a tortfeasor for willful, wanton, or reckless behavior. See Gilbert v. Duke Power Co., 179 S.E.2d 720, 723 (S.C. 1971); Rogers v. Florence Printing Co., 106 S.E.2d 258, 261 (S.C. 1958); see also Defender Indus., 938 F.2d at 505. And under federal law, a district court should not grant a judgment notwithstanding the verdict unless

13

there was no evidence presented in the case that would authorize the jury's verdict. See id. On appeal, we review the district court's refusal to grant a judgment notwithstanding the verdict only "to determine if, viewing the evidence in the light most favorable to the party [who] oppos[ed] the motion, [the] jury could reasonably find in favor of that party." Id.

Following both trials, the district court found that sufficient evidence was presented to support the jury's decision to award punitive damages, explaining that the defendant's conduct "at times . . . could be viewed as rising to the level of reckless disregard of Atlas' rights." And, upon our independent review of the record, we agree. It bears noting from the outset that none of the defendants now contests the first jury's findings that National Vendors had committed fraud, constructive fraud, breach of contract accompanied by a fraudulent act, and unfair trade practices and that National Vendors' two officers had committed constructive fraud.

Atlas presented sufficient evidence at both trials to create a jury question concerning whether National Vendors had acted at least recklessly in concealing the problems with its machines from Atlas. Employee memoranda and testimony established that National Vendors had known about the defects in its Eproms by 1990 and in Mars' validators by early 1991. Nevertheless, from the spring of 1990 through 1992, National Vendors responded to Atlas' complaints about cash shortages by denying that its machines were susceptible to yank-cheating, pleading ignorance about the source of Atlas' problems, and persuading Atlas to spend $30,000 on a different type of coin rejecter for its machines. Moreover, although testimony at both trials indicated that National Vendors had received similar complaints about cash shortages from other customers, National Vendors told Atlas that it was its only customer experiencing such problems. Indeed, National Vendors personnel testified that it was company policy not to inform customers of any problems with National Vendors machines unless absolutely necessary, and National Vendors' own expert witness on the vending machine industry admitted that National Vendors had never revealed to him the cause of the problems with the machines. Although National Vendors insisted at both trials that it had confronted Mars when it discovered its machines were vulnerable to yank-cheating and that Mars had assured it a newly developed valida-

14

tor would solve the problem, Atlas' early 1992 inventory of its National Vendors machines revealed that National Vendors had sold Atlas most of its defective machines after learning of their susceptibility to yank-cheating.

Atlas also adduced sufficient evidence before both juries to prove that National Vendors had committed "economic blackmail" by refusing to ship it vending machines in May 1992. In an attempt to force National Vendors to resolve the problems with its machines, Atlas began in early 1992 to place in an interest bearing escrow account payments due to National Vendors for machines Atlas had already purchased. In response, National Vendors informed Atlas' chairman that it wanted Atlas to bring its account current and, on April 6, 1992, placed Atlas on a "cash terms" basis only. Needing to fill its equipment commitments and believing that "cash terms" meant C.O.D. only, Atlas ordered 24 more vending machines from National Vendors, C.O.D., in late April. National Vendors accepted the order and promised shipment by May 14, 1992. Although it had decided by May 1, 1992, not to ship the machines unless Atlas released the money it had placed in escrow, National Vendors waited until May 14, 1992, to inform Atlas of its decision. We share the district court's view that "National's explanation that `cash basis' meant that all sums on account were due before the machines would be delivered, rather than simply meaning that Atlas had to pay cash for them, was less than convincing." Furthermore, Steven Freedman admitted in his testimony that National Vendors' failure to notify Atlas before May 14 resulted from "a business decision."

Finally, the evidence at both trials showed that Freedman had accepted Atlas' April 1992 order for the additional vending machines and that both he and Richard Ricci had participated in the decision not to ship those machines to Atlas. Accordingly, we agree with the district court that both National Vendors officers were"intimately involved" in the actions underlying National Vendors' liability for constructive fraud and conclude that there was sufficient evidence to sustain the jury's decision to hold them, along with their employer, liable to Atlas for punitive damages.

Under the circumstances, we believe this case is easily distinguished from Mosser v. Fruehauf Corp., 940 F.2d 77 (4th Cir. 1991),

15

upon which National Vendors so heavily relies. In Mosser, we affirmed the district court's decision to set aside a punitive damages award in a wrongful death action against the manufacturer of an allegedly defective flatbed trailer where the plaintiff had failed to adduce any proof that the defendant had any prior notice of the danger presented by its aluminum side rail assembly system. While acknowledging that the defendant's internal breakdown of communications, which prevented the company from discovering the potential danger posed, may have been negligent, we found no record evidence revealing a "deliberate blind eye to danger." Id . at 86. Accordingly, we concluded that the "district court properly refused to inflate a case of carelessness into one of wanton disregard." Id. at 83-84.

We recognized in Mosser that while "[t]he difference between reckless misconduct and [negligence] is a difference in the degree of the risk" presented, the difference "is so marked as to amount substantially to a difference in kind." Id. at 85 (quoting Restatement (Second) of Torts § 500, cmt. g (1965) (omission in original)). Far from demonstrating that National Vendors, Ricci, and Freeman had merely acted negligently, Atlas' evidence created jury questions on whether the defendants had recklessly, knowingly, or intentionally misled Atlas by concealing problems with their vending machines and refused to ship machines that Atlas had ordered to pressure it into paying its outstanding debt. The juries concluded that they had. And we are convinced that the "difference in the degree" of the risk to which the defendants subjected Atlas makes this case different"in kind" from Mosser.

National Vendors also contends that the first jury's specific finding that the defendants' unfair trade practices were not"wilful or wanton" necessarily rendered the first punitive damages award "erroneous as a matter of law" because "[t]he conduct alleged to be the unfair trade practices was the same conduct which was alleged in support of [Atlas'] fraud claims." Even if we assume that National Vendors did not waive its inconsistent verdict argument by failing to raise it before the first jury was discharged, the argument is still not persuasive. Not only is the proper remedy for an inconsistent verdict a new trial, not judgment as a matter of law, see Griffin v. Matherne, 471 F.2d 911, 915 (5th Cir. 1973), but, more importantly, the first jury's findings are reconcilable.

16

An appeals court is "abjured to determine whether a jury verdict can be sustained, on any reasonable theory." Richardson v. Suzuki Motor Co., 868 F.2d 1226, 1246 (Fed. Cir. 1989); see also Hines v. IBG Int'l, Inc., 813 F.2d 1331, 1334 (4th Cir. 1987). And it must, therefore, harmonize seemingly inconsistent verdicts if there is any reasonable way to do so. See Gallick v. Baltimore & Ohio R.R. Co., 372 U.S. 108, 119 (1963). As the district court explained, because South Carolina authorizes a jury to award punitive damages "even when the wrongdoer does not actually realize that he is invading the rights of another, provided the act is committed in such a manner that a person of ordinary prudence would say that it was a reckless disregard of another's rights . . . the jury may well have found that, although National did not realize that it was engaging in unfair methods of competition or trade, its actions . . . displayed a reckless disregard to Atlas' rights." (Citations and internal quotations omitted).

V

Finally, we address National Vendors' assignments of error in connection with the second trial which was limited to the issue of punitive damages. While National Vendors accepts as a fall-back position the district court's reduction of compensatory damages and remittitur of the punitive damage award, it urges that the district court should have ordered a completely new trial on all issues. We disagree.

A

First, National Vendors contends that the district court abused its discretion in limiting the scope of the second trial to punitive damage issues because the same jury "passion, caprice or prejudice" that caused the court to order a remittitur "may have infected the jury's determination of liability as well as damages." Moreover, according to National Vendors, "the issue of punitive damages [was] so intertwined with the threshold issue of liability that a partial new trial on damages alone . . . create[d] jury confusion and uncertainty."

A district court's decision to order a new trial falls within the district court's discretion, and the propriety of granting a new trial on fewer than all of the issues in a case hinges on whether the issues to be retried are sufficiently "distinct and separable from the others that

17

a trial of [those issues] alone may be had without injustice." Gasoline Products Co. v. Champlin Refining Co., 283 U.S. 494, 500 (1931). Considerations of economy, fairness, and repose may provide justification for preserving a jury's liability determination that has been fairly and fully made and ordering only a new trial on damages "where there is no substantial indication that the liability and damage issues are inextricably interwoven, or that the first jury verdict was the result of a compromise of the liability and damage questions." Great Coastal Express, Inc. v. International Brotherhood of Teamsters, 511 F.2d 839, 846-47 (4th Cir. 1975). We review a district court's decision to grant a partial new trial for abuse of discretion. See Swentek v. USAir, Inc., 830 F.2d 552, 560 (4th Cir. 1987); Great Coastal Express, 511 F.2d at 847.

In this case, we find no indication in the record to support National Vendors' suggestion that the district court's decision to set aside the first jury's punitive damage award necessitated a full retrial on all issues because the jury's "prejudice" may have infected its rulings on Atlas' substantive claims. A jury's reasonable findings of liability and compensatory damages are not rendered unreasonable simply on the basis that it awarded an excessive amount of punitive damages. Moreover, in this case, the district court concluded that there was sufficient evidence to support the jury's liability and compensatory damage findings, and National Vendors has not appealed any of those rulings.

We also conclude that the district court's decision to limit the second trial to punitive damage issues was not an abuse of discretion based on the interrelationship of punitive damage issues with other issues in the case. All of the evidence relating to National Vendors' willful or wanton conduct was before the second jury, enabling it to render a proper verdict on both the liability for and amount of punitive damages.

B

For similar reasons, we also reject National Vendors' contention that the district court erred in commenting to the second jury about the findings made by the first jury and in allowing counsel for Atlas to comment similarly. A finding of liability and compensatory damage is not only a prerequisite to finding punitive damages, it provided

18

the jury with important background information. From our review of the record in the second trial we find nothing in the references to the first jury verdict that was capable of "incit[ing] the prejudice and passion of the jury."

C

Finally, National Vendors contends that the district court abused its discretion in admitting rebuttal testimony from Ellen Stoudemire during Atlas' rebuttal of National Vendors' case. Stoudemire, the former owner of Seacoast Vending Services, Inc. and the only National Vendors customer presented by Atlas at the second trial, testified that Seacoast Vending, like Atlas, had experienced cash shortage problems with National Vendors machines and that Stoudemire had reported those problems to a National Vendors sales representative in the spring of 1991. According to National Vendors, Stoudemire's testimony "in no way rebutted any matters raised in defendant's case," but was merely used to support Atlas' case-in-chief.

While it appears that Stoudemire's testimony was offered to rebut Glenn Peters' testimony that he could not remember discussing cash shortages with her, even if we assume that Stoudemire's testimony was not true rebuttal testimony, we cannot agree that the court abused its discretion in altering the order of proof or that the alteration in the order of proof significantly prejudiced National Vendors. If National Vendors was surprised or prejudiced by the testimony, it could have requested surrebuttal, which it did not do.

For the foregoing reasons, we affirm the district court's rulings on all points challenged in this appeal.

AFFIRMED

19